UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHELDON HAAG,<br><br>Defendant | Criminal No.    23cr10167<br><br>Violation:<br><br>Count One: Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

# INFORMATION

At all times relevant to this Information:

## General Allegations

1. The defendant, SHELDON HAAG, lived in Connecticut and worked as a broker at a real estate brokerage company (the "Brokerage").

2. Co-Conspirator 1 ("CC1") lived in Connecticut and worked at the Brokerage, where he managed a team of brokers, including HAAG, and represented banks and other mortgage holders in the sale of distressed residential properties.

3. Co-Conspirator 2 ("CC2") lived in Connecticut and owned the Brokerage.

4. Co-Conspirator 3 ("CC3"), Co-Conspirator 4 ("CC4), and Co-Conspirator 5 ("CC5") were straw buyers in the fraud scheme described below.  CC3 was related to HAAG.

5. CC5 Construction was a limited liability company registered in Connecticut and in Massachusetts, that falsely purported to be a construction company owned by CC5.

6. J.P. Morgan Chase Bank, N.A. ("Chase") was a bank based in New York, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

7. U.S. Bank, N.A. ("U.S. Bank") was an FDIC-insured bank based in Ohio.

8. Select Portfolio Servicing, Inc. ("SPS") was mortgage servicing company, based in Utah, that handled short sales of properties.

## Overview of the Conspiracy

9. Beginning in or about 2015, HAAG conspired with CC1 and others known and unknown to the U.S. Attorney to defraud banks, mortgage servicers, and other clients of the Brokerage by purporting to act as their brokers in the sale of distressed residential real estate while secretly purchasing those properties themselves, at favorable prices, in the names of straw buyers, and later reselling them at a profit. As part of the scheme, HAAG and CC1 further defrauded their clients by submitting fraudulent and inflated bids for repair work at the properties in the name of CC5 Construction and other contractors, and secretly pocketing the difference between the inflated costs their clients paid and the actual cost of the repairs.

## Objects and Purposes of the Conspiracy

10. The object of the conspiracy was to commit wire fraud by, among other things, secretly purchasing distressed properties from clients of the Brokerage at below-market prices and reselling them at a profit, and overcharging clients for repair work at those properties. The principal purpose of the conspiracy was to enrich the co-conspirators and to avoid detection of the fraud scheme by clients, law enforcement, and others.

## Manner and Means of the Conspiracy

11. Among the manner and means by which HAAG, CC1, and others known and unknown to the U.S. Attorney carried out the conspiracy were the following:

   a. Recruiting straw buyers to purchase distressed properties from clients of the Brokerage, while hiding the fact that HAAG and CC1 were the actual

        buyers of the properties for which they also served as the clients' real estate brokers;

    b.     Creating fake competitive bids to deceive clients of the Brokerage into selling properties to the straw buyers;

    c.     Falsely certifying that real estate transactions were "arms-length" and that there were no undisclosed business relationships among the buyer and the real estate brokers; and

    d.     Submitting false and fraudulent bids to clients of the Brokerage from CC5 Construction and other construction companies for repairs on the properties the clients were selling.

### Acts in Furtherance of the Conspiracy and the Scheme to Defraud

12.     Beginning in or about 2015 and continuing through at least in or about 2021, HAAG, CC1, and other co-conspirators known and unknown to the U.S. Attorney committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

*Sale of the Stamford Property in Bankruptcy*

13.     On or about November 3, 2015, CC1 executed an affidavit in support of an application to employ the Brokerage and CC1 as the brokers for the short sale of a residential property in Stamford, Connecticut (the "Stamford Property") as part of a bankruptcy proceeding. A "short sale" is the sale of a property for less than the outstanding mortgage debt on that property. In the affidavit, CC1 falsely represented that he "and each member of [his] firm [was] a 'disinterested person'" and "that no member of [his] firm held or represent[ed] any interest adverse to the [bankruptcy] Estate."

14. On or about that same day, HAAG emailed the signed Affidavit, which HAAG notarized, to the U.S. Bankruptcy Trustee, who was selling the Stamford Property as part of the bankruptcy proceeding, subject to approval from U.S. Bank, which held a mortgage on the property in the amount of $498,500.

15. On or about November 11, 2015, CC3—acting at the direction of HAAG and CC1—contract to buy the Stamford Property for $350,000. The offer was rejected.

16. On or about December 9, 2015, HAAG told a co-conspirator that the Stamford Property had a value of $530,000.

17. On or about February 2, 2016, CC3 signed a second contract to buy the Stamford Property for $430,000.

18. On or about May 2, 2016, after CC3's second offer had been accepted, HAAG arranged for a wire transfer in the amount of $430,000 from Brookline Bank in Massachusetts to a real estate attorney in Connecticut who handled the closing.

19. On or about May 3, 2016, CC3 closed on the purchase of the Stamford Property for $430,000.

20. On or about August 8, 2016, CC3—acting at the direction of HAAG and CC1—closed on the sale of the Stamford Property to a third party for $590,000.

*Short Sale of the East Hartford Property*

21. On or about April 22, 2015, CC1 directed HAAG to list a short-sale property in East Hartford, Connecticut (the "East Hartford Property") for their client, SPS.

22. On or about September 19, 2016, CC4, acting at the direction of HAAG and CC1, executed a purchase and sale agreement to buy the East Hartford Property for $62,000.

23. On or about January 23, 2017, CC4 executed an affidavit falsely attesting that there were "no agreements, understandings, contracts, or offers relating to the current sale or subsequent sale of the Property that ha[d] not been disclosed" to SPS. In fact, CC1, who signed the affidavit as "buyer's agent," and HAAG, who signed the affidavit as "seller's agent," had agreed to pay CC4 $2,500 for acting as a straw buyer on the transaction. In addition, CC1 and HAAG had secretly agreed to sell the property after they caused CC4 to buy it, and to split the profits.

24. On or about February 10, 2017, CC4 executed an "Affidavit of Arm's Length Transaction" required by SPS to close the short sale and falsely attested, among other things, that the sale of the East Hartford Property was "an 'arm's length' transaction, between Seller(s) and Buyer(s) who [were] unaffiliated by . . . commercial enterprise" and that there were "no hidden terms or hidden agreements or special understandings between the Seller and the Buyer or among their respective agents that [were] not reflected in the Agreement."

25. On or about July 17, 2017, acting at the direction of HAAG and CC1, CC4 sold the East Hartford Property for $138,000, a $76,000 premium over the purchase price.

26. Thereafter, CC1 caused the proceeds of the East Hartford Property sale to be disbursed to the co-conspirators, with approximately $18,000 going to HAAG, approximately $29,000 going to CC1, and $2,500 going to CC4.

*Sale of the Weston Property in Bankruptcy*

27. On or about November 25, 2015, CC1 executed an affidavit in support of an application to employ the Brokerage and CC1 as the real estate brokers for the sale of a property in Weston, Connecticut (the "Weston Property"). In the affidavit, which HAAG notarized, CC1 falsely represented that he "and each member of [his] firm [was] a 'disinterested person'" and "that no member of [his] firm held or represent[ed] any interest adverse to the Estate."

28. On or about the same day, CC1 executed an "Exclusive Right to Sell Agreement" with the U.S. Bankruptcy Trustee, under the terms of which CC1 agreed to act as the U.S. Bankruptcy Trustee's real estate broker.

29. On or about March 25, 2016, CC4, acting at the direction of HAAG and CC1, executed a contract with the U.S. Bankruptcy Trustee for a short sale of the Weston Property for $245,000, subject to approval of the United States Bankruptcy Court for the District of Connecticut and Chase Bank, which held the mortgage of $410,000.

30. On or about May 16, 2016, HAAG, CC4, and CC1 executed an affidavit falsely attesting that there were "no agreements, understandings, contracts, or offers relating to the current sale or subsequent sale of the Property that have not been disclosed to the Servicer." In fact, CC4 was buying the Weston Property at the direction of CC1 and HAAG, who planned to renovate and resell it and split the proceeds.

31. On or about June 9, 2016, CC4 bought the Weston Property for $245,000.

32. Thereafter, CC1 and HAAG oversaw the renovation of the Weston Property.

33. On or about February 14, 2017, CC4, acting at the direction of HAAG and CC1, sold the Weston Property to a third party for $483,000.

*CC5 and CC5 Construction*

34. In about 2017, CC5 agreed with HAAG to create a front company that HAAG and CC1 could use to conduct real estate transactions and bid on construction projects without disclosing their involvement in the transactions, in exchange for a payment of $500 per month. In fact, CC5 was not a contractor and did not do any construction work.

35. On or about April 5, 2017, pursuant to that agreement, CC5 registered CC5 Construction as a corporation in Massachusetts and Connecticut.

36. On a date unknown, but no later than in or about 2017, CC5 agreed to allow HAAG and CC1 to use his identity to purchase homes for their benefit, in exchange for a payment of $2,500 to CC5 for each home purchased.

*Contractor Bid Rigging With CC5 Construction*

37. Between in or about May 2017 and in or about November 2020, HAAG solicited renovation projects for CC5 Construction on properties the Brokerage had agreed to list for sale, while awarding the actual work to contractors who charged less money. Through this aspect of the fraud scheme, HAAG and CC1 earned additional fraudulent profits of more than $1.3 million.

38. As one example, on or about November 8, 2017, CC1 told HAAG that the Brokerage would handle the short sale of a property in Springfield, Massachusetts (the "Springfield Property") for U.S. Bank and that HAAG would be the seller's broker.

39. On or about November 9 and 10, 2017, HAAG created a fake bid from CC5 Construction for work on the Springfield Property in the amount of $4,339.08 and HAAG obtained a fake bid from yet another contractor for $4,650.

40. Thereafter, HAAG submitted the CC5 Construction bid for $4,339.08 and the bid of $4,650 to U.S. Bank's mortgage servicer, which accepted the bid from CC5 Construction.

41. CC5 Construction invoiced U.S. Bank's mortgage servicer for the work in the amount of $4,339.08, but CC1 and HAAG had another contractor do the work for $2,720 and kept for themselves the $1,360 difference between CC5 Construction's fake bid and the real invoice.

*Sale of the Staten Island Property*

42. On or about February 26, 2021, CC1 forwarded a listing for a property owned by the Veteran's Administration ("VA") to HAAG to list for sale at a price of $487,500.

43. On or about March 5, 2021, CC1 instructed HAAG to pretend to engage with bona fide third party buyers, writing, "Play it out a little so we can document system that we were responsive and trying to work with buyers who called in."

44. On or about March 9, 2021, a VA purchase and sale agreement for the Staten Island Property was purportedly executed by CC5. The form contained the representation that the property was not being purchased "directly or indirectly by or for . . . any agents [or] brokers." The form listed CC2 as the principal broker and CC1 as the "sales person." CC1 docu-signed the VA purchase and sales agreement.

45. On or about March 18, 2021, HAAG applied for a loan to renovate the Staten Island Property, on which he represented that the current, "as-is" value of the property was $550,000.

46. On or about April 29, 2021, HAAG transferred $12,615.62 into the CC5 Construction bank account; CC1 transferred $100,000 into the CC5 Construction bank account; and $107,615.62 was wired from the CC5 Construction bank account to the closing agent for the sale of the Staten Island Property.

47. According to the HUD-1, CC5 Construction acquired the Staten Island Property on April 29, 2021.

48. Thereafter, CC1 and HAAG oversaw the renovation of the Staten Island Property, and on or about September 21, 2021, CC5 sold the State Island Property for $659,000.

## COUNT ONE
## Conspiracy to Commit Wire Fraud
## (18 U.S.C. § 1349)

The United States Attorney charges:

49. The United States Attorney re-alleges and incorporates by reference paragraphs 1-47 of this Information.

50. From in about 2015 to at least in or about 2021, in the District of Massachusetts and elsewhere, the defendant,

### SHELDON HAAG,

conspired with others known and unknown to the U.S. Attorney to commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C))

The United States Attorney further alleges:

51. Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One, the defendant,

SHELDON HAAG,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following asset:

   a. [Money Judgment Amount], to be entered in the form of a forfeiture money judgment.

52. If any of the property described in Paragraph 51, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 51 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

_____
KRISS BASIL
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS